Raoul J. Severo, Esq.   (SBN 078104)
**SEVERO LAW GROUP**
**A Professional Corporation**
70 South Lake Avenue, Ste. 945
Pasadena, CA 91101
Tel:    877-543-1190
Fax:   626-227-0505
Email:   raoul@severolegal.com

Attorneys for Defendant,
DAVID KAUP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff/Respondent,<br><br>vs.<br><br>DAVID R. KAUP,<br><br>        Defendant/Petitioner. | Case Number: CR 12-00195-MMM<br><br>**SENTENCING MEMORANDUM** |

**TO UNITED STATES ATTORNEY ANDRE BIROTTE, JR. AND ASSISTANT UNITED STATES ATTORNEY JAMES BOWMAN:**

Defendant David Kaup, by and through his attorney of record, Raoul J. Severo,

hereby files his sentencing position and memorandum of points and authorities

Respectfully submitted,

SEVERO LAW GROUP, PLC

Dated:   May 12, 2014                    _/s/ RAOUL J. SEVERO_____
                                        RAOUL J. SEVERO
                                        Attorney for Defendant
                                        DAVID KAUP

# I

## INTRODUCTION

David Kaup pled guilty to a two count pre-indictment, pre-complaint information charging violations of the wire fraud statute, 18 U.S.C Section 1343 arising out of a scheme to defraud homeowner victims.

Pursuant to a written plea agreement, the parties agreed to a 78 month sentence, the high end of a range of 63 to 78 months derived from the computation of a base offense level of 7, plus a 16-level upward adjustment for a loss of between $1 million and $2.5 million pursuant to USSG § 2B1.1 (b)(1)(I); a 4-level upward adjustment for 50 or more victims pursuant to USSG § 2B1.1(b)(2); a 2 level upward adjustment for aggravating role pursuant to USSG § 3B 1.1 (c); and up to a 3 level reduction for acceptance of responsibility pursuant to USSG § 3E1.1.

As will be discussed in more detail below, Mr. Kaup failed to appear for his schedule sentencing hearing on December 17, 2012.   Based thereon, the Government has announced that it no longer feels bound by the terms of the plea agreement entered into with Mr. Kaup and that it will make its sentencing arguments for revoking credits Kaup may have received for acceptance of responsibility and will, further, seek enhancements for obstruction of justice pursuant to USSG § 3C1.1.

As of this writing, the Government has filed an Ex Parte Application seeking a declaration by the court that Mr. Kaup has breached the plea agreement.

Accordingly, Mr. Kaup will likewise present his position on sentencing as not being bound by the terms of the plea agreement with the Government.   It should be noted that counsel for Mr. Kaup has not had an opportunity to fully review the discovery supporting the case against Mr. Kaup, most of which was provided by the Government on April 30-May 1, 2014,   and, therefore, this memorandum is only based on a

preliminary review of incomplete information provided by the Government.

Finally, during a six month period in 2011, Mr. Kaup participated in another investment venture called FMW.   Mr. Kaup's participation in FMW was qualitatively different than his participation in ALF.   Mr. Kaup provided an initial $20,000 loan to his brother in law, Ron Alex Hernandez, to start FMW along with Carlo Montani, who was recruited by Mr. Hernandez to be the head of FMW due to Mr. Hernandez' past criminal record.

As set forth in Mr. Montani's Proffer (Declaration of James Bowman, Exhibit A, Government Sentence Position re David Kaup, Docket No. 32):

> "MONTANI was originally approached by ALEX HERNANDEZ ...about opening the company.    HERNANDEZ gave MONTANI the following guidelines about FMW:   they would require an up-front deposit from customers, the customers would fill out all the other formal paperwork, and they would offer a low interest rate... the third partner was DAVID KAUP (KAUP), who also had mortgage experience...MONTANI first met KAUP after the company was started.   HERNANDEZ told MONTANI that KAUP was the trader (Page 2)...KAUP conducted the trading.   KAUP was the only one with access to the trading account..." (Page 3).

It is worth remembering that, as the Probation Department states, FMW operated during a 4 month period between April, 2011 until August 5, 2011, when Mr. Kaup resigned from FMW after realizing that the refinancing loans were not being made and the deposits were not being refunded to customers.   (*PSR*, Par. 24 at p. 8)

In its sentencing memorandum, the government proposes a guidelines-centered approach that is not only contrary to current law but factually incorrect in several respects.

This memorandum will present the court with the various factors that should guide the court in making its decision and which will indeed support a just sentence that fully satisfies all four objectives of the sentencing scheme.

**3**

## II. **PROCEDURAL POSTURE**

Defendant DAVID KAUP was summoned on March 2, 2012 to appear on March 19, 2012 on an Information charging him with two counts alleging violations of 18 U.S.C. § 1343 [Docket for case number 2:12-CR-00195, Doc. #1].    A Plea Agreement with the Government was entered on the docket of this court at the same time as the Summons. He was taken before a magistrate judge of this court and released on bond on the same date.    On April 9, 2012, pursuant to the plea agreement reached with the government, the defendant entered a guilty plea to the two counts of the Information alleging violations of 18 U.S.C. § 1343, wire fraud in connection with the operation of ALF and FMW.

As discussed in more detail below, Defendant Kaup failed to appear on the date set for sentencing, December 17, 2012, thereby allegedly breaching the agreement with the government.

## III. ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

As a result of the dual majority opinion in U.S. v. Booker 543 U.S. 220, 125 S. Ct. 738; 160 L. Ed. 2d 621 (2005), the final sentencing analysis is done under 18 U.S.C. § 3553(a)(1).    As a component of that analysis, the range provided in the Guidelines is considered by the court, but only on an advisory basis.    U.S. v. Booker, *supra,* opinion by Breyer, J. at page 756.    Thus, while the Guidelines calculation is a required consideration under § 3553(a)(4), the statute permits the district court to fashion a sentence in light of all other statutory concerns as well.    U.S. v. Menyweather, 447 F.3d 625 (9th Cir. 2006).

In determining the sentence in an advisory guideline regime, this court is obligated to follow the mandate of § 3553(a), i.e., to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the sentencing purposes of subsection (2).

Those purposes are the following:

      (A)  to reflect the seriousness of the offense, to promote respect for the law,

      (B)  and to provide just punishment for the offense;

      (C)  to afford adequate deterrence to criminal conduct;

      (D)  to protect the public from further crimes of the defendant; and

      (E)  to provide the defendant with needed educational or vocational

          training, medical care, or other correctional treatment in the most

          effective manner.    18 U.S.C. § 3553(a)(2).

In determining the sentence, courts must also consider:

    1)    the nature and circumstances of the offense and the history and

       characteristics of the defendant" § 3553(a)(1);

    2)    the kinds of sentences available" § 3553(a)(3);

    3)    the need to avoid unwarranted sentence disparities among

       defendants with similar records who have been found guilty of

       similar conduct" § 3553(a)(6); and

    4)    the need to provide restitution to any victims of the offense."

       § 3553(a)(7).

"[N]o limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The United States Sentencing Guidelines are not the only, or even the primary, consideration in fashioning a sentence — they are purely advisory. *Booker,* 543 U.S. at 260-61. The district court is governed by the "overarching statutory charge" to "impose a sentence sufficient, but not greater than necessary" to reflect the "seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate

**5**

deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a) and a)(2)).

In assessing these factors, neither the statute nor *Booker*, suggests that any one factor is more important, or to be given greater weight, than any other.   As seen in the wording of § 3553, the overriding principle in sentencing is that the court is required to impose a sentence "sufficient, but not greater than necessary," to comply with the express purposes of sentencing found at subsection (a)(2), to wit, retribution, deterrence, incapacitation, and rehabilitation.

One court has been led to express that this overriding principle is not just a factor to be considered, but rather, it sets a limit on the sentence that the court may impose. *United States v. Denardi*, 802 F.2nd 269, 277-77 (3rd Cir. 1989)(Becker, J. concurring in part, dissenting in part).

In *Kimbrough v. United States*, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), the Supreme Court specifically highlighted the importance of the "sufficient, but not greater than necessary" mandate of § 3553(a).   It held that "under Booker, the cocaine Guidelines, like all other Guidelines, are advisory only.... A district judge must include the Guidelines range in the array of factors warranting consideration.   The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing," to wit, retribution, deterrence, incapacitation, and rehabilitation.

On the same day that *Kimbrough* was decided, the Court also issued its opinion in *Gall v. United States*, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).   The Court in Gall also reiterated the principle that the Guidelines are not mandatory, "and thus the range of choice dictated by the facts of the case is significantly broadened.   Moreover, the

**6**

Guidelines are only one of the factors to consider when imposing sentence...."   <u>Id.</u> at page 602.

Recognizing that imprisonment is not a proper method of achieving rehabilitation, see 18 U.S.C. § 3582, some courts have found abhorrent any sentence that does not promote such rehabilitation.   See *U.S. v. Peterson*, 363 F.Supp.2d 1060, 1062 (E.D.Wis.2005; *U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y.2005).

Here, the government argues in broad strokes that defendant should be subjected to lengthy imprisonment.   This argument leans heavily on the guidelines calculations, while overstating the defendant's conduct, but lightly mentioning the crux of federal sentencing: a considered analysis of all 3553(a) factors to achieve the objectives of sentencing, viz., retribution, deterrence, incapacitation, and rehabilitation.

Defendant postulates that all the factors lead ineluctably to the conclusion that the four objectives of sentencing can be amply achieved by a less harsh sentence of imprisonment.

### A.   <u>Nature and Circumstances of the Offense (§3553(a)(1)).</u>

The conduct of Mr. Kaup, undoubtedly constitutes an offense under section 1343, which can be characterized as an intentional act to defraud the depositors of ALF and FMW.   The conduct was criminal, unethical and reprehensible.   Accordingly, the court should impose a sentence that addresses his criminal conduct.

### B.   <u>History and Characteristics of the Defendant</u>

As noted in the PSR, at page 13, defendant is 31 years old.   His family is aware of this case and is fully supportive of him.   From the time of his childhood, Mr. Kaup, whose mother worked as a bookkeeper and his father occupied the role of stay at home father, grew up in a gang infested area of El Monte, California, in a household always in financial straits, with his parents barely enough to provide for basic needs of Mr. Kaup and his two sisters.   From the time he was 16 years old, Mr. Kaup has been afflicted with the disease of substance abuse with alcohol, cocaine and ecstasy being his drugs of

choice.

As a result he had contacts with law enforcement as set forth at page 15 of the PSR, including juvenile adjudications for passing a bad check and attempted residential burglary.   At the age of 17, after his parents discovered he was abusing drugs and having contacts with law enforcement, he was sent to live with his paternal grandparents in Orland Park, Illinois, until the age of 19.

Upon his return to California, as Mr. Kaup states in his letter to the Court, it was clear that under his grandfather's tutelage, he had learned that hard work, perseverance and education would constitute his passport to a better life.

As the letters written by friends and family to the Court attest, Mr. Kaup has always been a charitable and trusted friend, a sympathetic and caring family man, and someone who is always willing to help in times of need though, as acknowledged by the correspondents, bedeviled by his addictions. (See *PSR*, pp. 16-17)

As Mr. Kaup states in his letter to this Court, the offense conduct in this case stems from a long standing addiction to gambling and drugs which has afflicted him since he was 17 years of age.    While his addictions do not justify or excuse the conduct, they point up the need for Mr. Kaup to undergo extensive rehabilitation as one of the factors that under Section 3553 deserves to be more heavily weighed than other factors.

**C.     Objections to PSR Based on Amount of Loss and Number of Victims.**

Based upon a preliminary review of the evidence provided by the Government in discovery, counsel for Mr. Kaup believes that the calculations concerning the amount of loss occasioned by Mr. Kaup's fraud and the number of victims associated therewith are both overstated.

Mr. Kaup resigned his position and severed all connections with FMW effective August 5, 2011.   Although not provided by the Government, the Government is in possession of all digital copies of checks pertaining to the account maintained by FMW

at Bank of America.   Amongst those checks, is a final check bearing that legend paid to Mr. Kaup upon his termination of employment with FMW.   The court is hereby requested that it order the Government to disclose all digital copies of checks drawn on the FMW Bank of America account to the defense for purpose of enabling defendant to support this argument.   Unless the court does so, defendant begs leave of court to subpoena the Bank of America records to marshall the aforesaid evidence.

Based on the Government's financial analysis, there were ten deposits made after Mr. Kaup's FMW termination date of August 5, 2011, that were added to his victim count without any reason therefor.   The break down is as follows below for First Mortgage West Victims:

| | | | | |
|---|---|---|---|---|
| 1) | Amy Adams | $34,481.16 | 08/18/2011 | Bank of America |
| 2) | Gordon Brown | $30,000.00 | 08/08/2011 | Bank of America |
| 3) | Robert Stivender | $15,600.96 | 08/31/2011 | Bank of America |
| 4) | Robert Goy | $20,000.00 | 08/17/2011 | Bank of America |
| 5) | Ken & Karla Jones | $29,618.40 | 08/24/2011 | Bank of America |
| 6) | Steve Mairose | $12,652.08 | 08/09/2011 | Bank of America |
| 7) | Joseph Watson | $26,000.00 | 08/15/2011 | Bank of America |
| 8) | Chang-Hua Chen | $40,959.72 | 08/08/2011 | Bank of America |
| 9) | Joann Dibiase | $17,194.44 | 08/29/2011 | Bank of America |
| 10) | Daniel Gardner | $8,379.28 | 08/23/2011 | Bank of America |

REVISED LOSS CALCULATION:

| | |
|---|---|
| $ 1,791,737.00 | Presentence Report Loss Amount (P.5 of 26 Paragraph 10) |
| $ 234,886.14 | Revised Loss Amount Pertaining to 10 Victims |
| $ 1,556,851.86 | Revised Total Loss Amount Minus Correction of Victims |

**9**

NUMBER OF VICTIMS:

| | | |
|---|---|---|
| ALF | 23 Victims | Pre Sentence Report (P. 7 of 26 Paragraph 21) |
| FMW | 20 Victims | Revised Bank of America Reference Victim from May |
| | | Through August 5., 2011 |
| Total | 43 Victims | Correct Victim Count |

**D.    An Advisory Guideline Sentence is Overly Punitive In This Case.**

In considering an appropriate sentence, a court may choose to disagree with the Guidelines where the Sentencing Commission did not act in the "exercise of its characteristic institutional role when promulgating the Guidelines in question. (E.g., In *Kimbrough*, the Supreme Court acknowledged that not all guidelines are equal, stating that the crack guidelines "...do not exemplify the Commission's exercise of its characteristic institutional role...which allows the Commission to "base its determinations on empirical data and national experience guided by professional staff" *Kimbrough*, 552 U.S. at 109 citing *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)

The Sentencing Commission used an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports in developing most of the Guidelines.    When enacting the Fraud Guidelines, however, the Commission chose "to depart from past practices," See U.S. Sentencing Commisssion, *Fifteen Years of Guidelines Sentencing* (2004) http://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Henderson_15Year.pdf, based upon the belief that too many white collar offenders were receiving probationary sentences.    *Id* at p. 56.    As former federal judge Paul G. Cassell and former federal prosecutor Brett Tolman noted, "Rather than resting on evidence of past, national sentencing practices, the white collar Guidelines are a product of the political environment in which they were promulgated..." (Available at http://justiceforsholom.org/Cassell_Tolman.pdf.)

The most egregious example of problems in the Fraud Guidelines is the loss table, which represents the most critizized aspect of the Fraud Guidelines.   The loss table under §2B1.1 is one of the few Specific Offense Characteristics allowing for double digit increases with most of the other six guidelines that allow for such increases being related to terrorism.   As one court noted, the Guidelines, "because of their arithmetic approach also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."   *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006.)

Although, generally speaking, larger frauds require deterrence and more serious punishment, the scaling of the guideline ranges becomes as much of an exercise in arbitrary, line drawing as anything else.   Thus, a 46 month sentence is as equally compelling as a 78 month sentence in apportioning punishment based upon moral seriousness as a measure of retribution and deterrence.   While it may be argued that such a sentence is not as effective in terms of incapacitation of the defendant, the fact of spending almost four years in prison, followed by a lengthy period of supervised release, with all of the attendant stigma and practical consequences in terms of post incarceration, employability have similarly crippling effects.

**E.    Co Defendant Disparity.**

Mr. Kaup's co-defendant, Ron Alex Hernandez, was sentenced by this Court to 70 months in prison based upon a loss of over $1 Million, with 50 or more victims, and a Criminal History category III based upon an ample past criminal record.   Mr. Carlos Montani was sentenced by this Court to 46 months based upon the FMW fraud which, as to Mr. Montani, involved more than 50 victims.

In order to prevent disparity between co-defendants, it is respectfully submitted that Mr. Kaup should be sentenced in accordance with the following guidelines calculation:

| | |
|---|---|
| Base Offense Level: | +7 |
| Loss Over $1 Million: | +16 |
| More than 10 Victims: | +2 |
| Role in Offense | +2 |
| Acceptance of Responsibility | - 2 |
| Departure Sentencing Disparity | - 1 |
| TOTAL OFFENSE LEVEL | 24 |

Based upon the aforestated total offense level, with a criminal history category of I, it is respectfully requested that this Court sentence Mr. Kaup to a total of 51 months imprisonment, a sentence which is at the low end of the 51-63 month range corresponding to the pertinent offense level and criminal history.

**IV.   DEFENDANT KAUP'S FAILURE TO APPEAR FOR SENTENCING SHOULD BE MITIGATED BECAUSE IT WAS BASED ON A GENUINE FEAR OF THREATS RECEIVED BY HIM AND WAS THE PRODUCT OF ALCOHOL AND DRUG ABUSE.**

Defendant Kaup accepted responsibility for his misconduct by taking steps, at the first available opportunity, to reach a plea agreement with the government thereby avoiding the need for a time-consuming and expensive effort by the United States' Attorney's Office to mount a trial against him and his co conspirators.    Mr. Kaup cooperated in everything that he was asked to do prior to his sentencing. Unfortunately, for a period of weeks before his sentencing, Mr. Kaup continued to abuse alcohol,

cocaine and ecstasy in a vain effort to allay his fears that physical harm would be visited upon him once he became incarcerated as had been threatened for years by one of the former investors in Mr. Kaup's schemes, William Armstrong.

Mr. Armstrong had invested $500,000 in Lunden Investments.   Mr. Armstrong owned and operated a chemical company that manufactured and sold energy supplements to enhance athletes' performance during sporting events.   Mr. Armstrong is Australian and also resided in Temecula, California.   The funds for his investment were wired from an offshore account in Panama.

During the time that Mr. Armstrong's funds were leveraged in foreign currency transactions by Lunden Investments, Mr. Armstrong informed Mr. Kaup that he had borrowed the funds for the investment from "serious people"—intimating organized crime sources—and that if the funds were lost Mr. Kaup's life would be in "serious danger."

In early 2009, Mr. Kaup met with Mr. Armstrong at the latter's request at a local Starbucks restaurant in downtown Los Angeles, California.   Mr. Armstrong showed up to the meeting with two thuggish looking large men whom he referred to as his bodyguards.   The men asked for Mr. Kaup's vehicle keys and when Mr. Kaup refused to hand over the keys, they surrounded him and physically hustled him out of the restaurant and threatened him with physical harm unless he turned over the keys. Fearing for his life, Mr. Kaup acceded to their demands.   After the men drove off in Mr. Kaup's vehicle, Mr. Kaup reported the matter to the Los Angeles Police Department. The vehicle was recovered approximately one week later.

Mr. Armstrong and his cohorts subsequently vandalized a vehicle owned by Mr. Robert Miller, a former Wall Street executive who made the presentations to the investors, including Mr. Armstrong, in connection with the Lunden Investments matter.

The Los Angeles Police Department took incident reports based upon the foregoing events which include photographs of the vandalized vehicles.    Counsel for defendant has requested a continuance of the sentencing hearing to enable counsel to subpoena the aforesaid LAPD reports for the court's consideration.

Also, commencing in 2009 and continuing thereafter throughout 2012, Mr. Armstrong created fictitious email accounts in the name of Mr. Kaup and engaged in an extensive, public online campaign to persecute Mr. Kaup, posting online photographs of Mr. Kaup's young nieces and other family members, as well as private information such as social security numbers for Mr. Kaup and his family, enlisting others to engage in a letter writing campaign addresses to Mr. Kaup's family members and friends at their private home addresses.    Mr. Armstrong would demand the sum of $1 million from Mr. Kaup.    The United States Attorney's Office was informed of the actions and threats by Mr. Armstrong but stated that it could not be of any help.

Mr. Armstrong at various times informed Mr. Kaup that, as he had demonstrated on various occasions, he could and would reach out and get Mr. Kaup, "even in prison."

In the weeks preceding his scheduled sentencing hearing on December 17, 2012, Mr. Kaup had reverted to consuming large amounts of alcohol, ecstasy and cocaine. Finally, the pressure that Mr. Armstrong exerted as a result of his continuing course of public and private persecution of Mr. Kaup, took its toll and Mr. Kaup, fearing great bodily injury or even death, made the unfortunate decision to not appear at his sentencing hearing.

Duress usually entails a defendant arguing that he committed the crime in order to avoid unlawful physical threats made by a third party.    While the defense does not negate a defendant's *mens rea* or criminal state of mind, it serves to "negate a conclusion of guilt."    The defendant thus typically bears the burden of proving these

affirmative defenses.    *United States v. Bailey*, 444 U.S. at 409 (1980) (finding that duress involves a situation "where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law");    *Model Penal Co*de, § 2.09 ("It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, that a person of reasonable firmness in his situation would have been unable to resist."); 1 *Wharton's Criminal Law* § 52   (Charles E. Torcia ed., 15th ed. 2009, note 2 ("[W]hen a defendant engages in conduct which would otherwise constitute a crime, it is a defense that he was coerced to do so by the use or threatened use of physical force upon him or upon a third person.")

In *Dixon v. United States*, 548 U.S. 1 (2006), the Supreme Court had occasion to comment, albeit as dicta, on the specific elements of duress.    The Court noted that no federal statute had defined the term nor had the Court previously specified the elements of the defense.    Without officially adopting a definition, the Court accepted the district court's description of the elements of duress. Under this formulation, a defendant has to show (1) [he] was under an unlawful and imminent threat . . . of death or serious bodily injury; (2) [he] had not recklessly or negligently placed [himself] in [this] situation; (3) [he] had no reasonable, legal alternative . . . and (4) that a direct causal relationship [existed] between the criminal act and the avoidance of the threatened harm.    See also, *United States v. Vasquez-Landaver*, 527 F.3d 798 (9th Cir. 2008) *United States v. Atencio,* 586 F.2d 744, 746 (9th Cir. 1978)

Under U.S.S.G. § 5K2.12, a court may depart downward where a "defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense."

It should be emphasized that Mr. Kaup does not seek here to justify his failure to appear for sentencing herein, but instead desires to explain his state of mind in connection with said failure.

## V.    ACCEPTANCE OF RESPONSIBILITY

USSG §3E1.1 provides for a three level decrease in the offense level for a defendant that clearly accepts responsibility for his misconduct.   As is noted in the Commentary:

"3.    Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct) (see Application Note 1(A)), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a).  However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.  A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

4.    Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

5.    The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.   For this reason, the determination of the sentencing judge is entitled to great deference on review."

As previously noted, Defendant Kaup accepted responsibility for his misconduct by taking steps, at the first available opportunity, to reach a plea agreement with the government thereby avoiding the need for a time-consuming and expensive effort by the United States' Attorney's Office to mount a trial against him and his co conspirators. Mr. Kaup cooperated in everything that he was asked to do prior to his sentencing.

Mr. Kaup's failure to appear for sentencing as scheduled, for the reasons and under the circumstances set forth above, do not reflect a lack of acceptance of his responsibility as much as it reflects the effects of genuine fear of physical harm

exaggeraged by Mr. Kaup's drug induced state of paranoia.

Although it is clear that the Government does not intend to give Mr. Kaup credit for acceptance of responsibility as is it is at its discretion to do in accordance with Susection (c), this Court can still grant Mr. Kaup such credit for his acceptance of responsibility in cooperating from the commencement of the case at its pre-indictment stage, though to his failure to appear for sentencing, and Mr. Kaup urges the Court to do so.

## VI.   ADJUSTMENTS FOR OBSTRUCTION OF JUSTICE

USSG §3C1.1.  provides as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

A willful failure to appear for a judicial proceeding such as sentencing, as previously ordered, undoubtedly is the type of conduct that is covered by this section of the guidelines.   Whether a defendant who is under the influence of drugs can be said to possess the requisite intent so as to act "willfully" is another matter altogether.

Additionally, Mr. Kaup should not be doubly punished by increasing his offense level by two levels for obstructing justice by failing to appear at his sentencing hearing and by simultaneously increasing his offense level yet another two levels for not accepting responsibility for his criminal conduct where in fact, Mr. Kaup accepted responsibility for his criminal conduct and spared the government of the effort and expense associated with mounting a trial, and only failed to appear for sentencing based

upon a genuine fear of physical harm or death which may have been even more exaggerated as a result of Mr. Kaup's intoxicated state.

### VII.   VARIANCE BASED UPON U.S.S.G. § 5k2.13

Counsel has represented Mr. Kaup for a very short time, but has had an extensive opportunity to discuss the defendant's history, background, his offense conduct and related subjects.   Based upon counsel's conversations with defendant—particularly regarding defendant's untreated bipolar disorder with apparent manic tendencies, and depression, coupled with defendant's extensive history of alcohol and drug abuse, as well as gambling addiction, and examination of the discovery provided by the Government, it is apparent to counsel that Defendant needs to be examined by a mental health professional to assess the extent to which defendant may be entitled to petition this court for a downward departure from the sentencing guidelines based upon diminished capacity as set forth in U.S.S.G. § 5K2.13 due to the interplay of the aforestated psychological and emotional factors.

Additionally, defendant received extensive mental health treatment at a younger age at Kaiser Permanente Hospital, Baldwin Park, California and Hollywood, California and counsel is in the process of procuring these records by way of subpoena.

In this connection, Counsel has retained the services of a forensic psychologist, Lisa Murphy, Ph.D., of Beverly Hills, California, to examine Mr. Kaup and conduct an assessment of the various psychological and emotional forces that may have resulted in the offense conduct attributed to Mr. Kaup.   Dr. Murphy is in the process of seeking approval to enter the Metropolitan Detention Center in Los Angeles for this purpose. This requires a short period of time before approval is granted by the Warden of MDC-LA.   Dr. Murphy will require a reasonable amount of time to conduct the required

assessment and prepare a report of her findings for submission to the Court.

Based on the foregoing, counsel has filed an ex parte application to continue the sentencing hearing in this matter to enable Dr. Murphy to assess Mr. Kaup and report to this Court.   Counsel prays for leave of court to file a supplemental sentencing position brief concerning Dr. Murphy's findings in the event that this Court grants the ex parte application to continue sentencing.

## VIII.

## MR. KAUP REQUESTS A JUDICIAL RECOMMENDATION FOR THE RESIDENTIAL DRUG AND ALCOHOL TREATMENT PROGRAM

Pursuant to 18 U.S.C. § 3621 (e)m, 28 CFR §§ 550.50 et seq., and BOP Program Statements (P.S. 5330.11, 5331.02), Defendant David Kaup respectfully hereby requests a judicial recommendation for RDAP.   To be eligible for RDAP one must, inter alia, have 24 months or more remaining to serve, present a verifiable documented pattern of substance abuse or dependence within the 12 months preceding arrest on the underlying offense, have no serious mental or cognitive impairment precluding full program participation, be halfway house eligible, and sign acknowledgment of program responsibilities.

The PSR in this case adequately depicts Mr. Kaup's eligibility for RDAP program. Accordingly, the defense requests a judicial recommendation for the RDAP program at a BOP institution close to the Southern California area.   The defense also requests a judicial recommendation that Mr. Kaup be sentenced to an institution in the Southern California area to enable travel for visiting purposes by his father whose physical condition precludes him from traveling by airplane.

////

////

# IX.   CONCLUSION.

For all of the reasons set forth above, Mr. Kaup respectfully requests that he be sentenced in accordance with the foregoing.

Respectfully submitted,

SEVERO LAW GROUP
A Professional Corporation

Dated:   May 12, 2014                    /s/   _Raoul J. Severo_
                                         RAOUL J. SEVERO
                                         Attorneys for Defendant
                                         DAVID R. KAUP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2014, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrant:

AUSA James Bowman

*s/ Raoul J. Severo*